**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMIE C. SPIES,**<br><br>**PLAINTIFF,**<br>**v.**<br><br>**UGI UTILITIES INC.,**<br><br>**DEFENDANT.** | **Civil Action No.: ____________**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Jamie C. Spies, by and through her undersigned attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, punitive damages, and other relief on behalf of Plaintiff Jamie C. Spies (hereinafter "Ms. Spies" or "Plaintiff"), a former employee of UGI Utilities Inc., (hereinafter "UGI" or "Defendant"). Ms. Spies has been harmed by Defendant's harassment and discrimination on the basis of her age and disability or perceived disability, by Defendant's failure to engage in a good faith interactive process with respect to accommodating her disability, and Defendant's retaliation against her for seeking accommodations for her disability, for taking leave pursuant to the Family and Medical Leave Act (FMLA) and for complaining about harassment and discrimination.

2. This action is filed pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2611, et seq. ("FMLA").

## JURISDICTION

3. This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims alleged herein pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On January 22, 2026, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Pennsylvania Human Relations Commission ("PHRC"). On June 11, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.[1]

## VENUE

7. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

---

[1] It has been less than one year since Ms. Spies dual-filed her Charge of Discrimination as a Complaint with the Pennsylvania Human Relations Commission for Defendant's violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"). Ms. Spies will seek to amend her Complaint in this matter to add her PHRA claims once it has been greater than one year since her dual-filing. While Ms. Spies' original EEOC Charge was still pending, Ms. Spies was terminated. Ms. Spies is filing a separate EEOC Charge relating to the retaliation she experienced subsequent to filing her initial Charge, including her termination, and will also seek to amend her claims in this matter with respect to those claims, once she has exhausted her administrative remedies.

8. This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this judicial district, Plaintiff performed her work for Defendant in this judicial district, Plaintiff was terminated in this judicial district, and the claims arose in this judicial district.

**PARTIES**

9. Plaintiff Jamie C. Spies is an adult female citizen and resident of Reading, Pennsylvania and the United States of America.

10. Ms. Spies is forty-nine (49) years old and within the class of individuals protected against discrimination by the ADEA.

11. Ms. Spies is a qualified individual with a disability within the meaning of the ADA.

12. Ms. Spies has had her disability for a period far in excess of six months.

13. Ms. Spies' disability affects a major bodily function and substantially limits one or more major life activities.

14. Defendant UGI Utilities, Inc. ("UGI") is a corporation with its headquarters located at 1 UGI Drive, Denver, PA 17517, where Plaintiff was employed. UGI Utilities, Inc. is a wholly owned subsidiary of UGI Corporation, which is headquartered at 500 North Gulph Road, King of Prussia, PA 19406.

15. At all relevant times, Defendant UGI is and has been an employer employing more than five hundred (500) employees.

16. At all relevant times, employees of Defendant UGI acted as agents and servants for Defendant UGI.

17. At all relevant times, employees of Defendant UGI were acting within the scope of their authority and in the course of employment under the direct control of Defendant UGI.

18. At all times material hereto, Defendant UGI acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant UGI and in furtherance of Defendant UGI's business.

19. At all relevant times hereto, Plaintiff Jamie C. Spies was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

20. This cause of action arose out of transactions or occurrences that took place in whole or in part in Lancaster County, Pennsylvania.

21. Defendant is headquartered and conducts substantial business in Lancaster County, Pennsylvania.

22. This Honorable Court has personal jurisdiction over the Defendant.

## FACTS

23. In or about January 1999, Ms. Spies began employment with UGI.

24. Ms. Spies had a long and successful career at UGI spanning over two decades, and she most recently held the position of Principal Procurement Specialist.

25. Throughout her tenure with UGI, Ms. Spies was an exemplary employee and consistently executed her job duties in an exceptional and professional manner. Despite this, Ms. Spies has been subjected to discrimination, harassment and retaliation on the basis of her disability or perceived disability, and for seeking accommodations for her disability, including taking FMLA leave.

26. Ms. Spies has multiple disabilities and has been diagnosed with Post Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder (GAD), and Persistent Depressive Disorder (PDD), as well as Other Specific Personality Disorder with Obsessive-

Compulsive and Avoidant Traits, Vasovagal Syncope and stress-related Gastroesophageal Reflux Disease (GERD).

27. These conditions are triggered and exacerbated by stress and cause Ms. Spies to suffer from a variety of symptoms, including dissociation, inefficiencies in working memory and cognitive flexibility, heightened frustration, irritability, emotional reactivity, and a rigid, over-controlled response.

28. In February 2021, Ms. Spies was promoted to Manager of Operational Procurement as part of a reorganization of UGI's procurement function.While in the Manager position, Ms. Spies was required to continue performing her full individual contributor responsibilities in addition to her management duties, a burden that was not shared by other similarly situated managers at the same level.

29. Ms. Spies was also the only pensioned manager among her peers.

30. For example, in March 2021, Colin Marthinson, a male colleague under 30, was hired as a Category Manager, but Ms. Spies continued to be responsible for work that fell within Mr. Marthinson's purview. In December 2021, Mr. Marthinson was promoted to Manager of Category Management and presented as a leading contributor despite minimal output. Meanwhile, Ms. Spies continued to be denied resources while remaining overburdened with work, in continuing disparate and differential treatment.

31. In this manner, Ms. Spies was consistently overwhelmed with handling multiple roles and experienced extremely high levels of work-related stress, negatively impacting her ability to sustain a work-life balance or manage her disability-related symptoms.

32. Despite these significant hurdles, Ms. Spies continued to excel in her position, receiving the highest possible rating for her performance review in October 2021.

33. On multiple occasions, Ms. Spies communicated to UGI management about the impact of her heightened workload and increased stress levels on her mental health conditions, yet she did not receive any accommodations, or even any information about accommodations and the process to request them from the company.

34. Specifically, Ms. Spies explained the issues she was experiencing to Katherine McEntyre, the Director at that time, on or about July 26, 2021, and September 10, 2021, as well as in her 2022 Performance Review Acknowledgement.

35. Additionally, on or about February 8, 2022, Ms. Spies requested that Jodi Ho, the Senior Manager of HR, call her. During this call, Ms. Spies disclosed that the stress from work had exacerbated Ms. Spies' symptoms and she had become suicidal and requested a severance to leave the company. Ms. Ho responded that she "could only do what she could do" and that it "wasn't on her" regarding her staffing issues. Ms. Ho suggested the Employee Assistance Program to Ms. Spies, but there was no discussion or offer of accommodations.

36. On or about May 13, 2022, Ms. Spies was presented with a Retention Bonus acknowledging her "significant workload" and the high expectations in order to receive such a retention bonus. This was the same 'significant workload' Ms. Spies had identified to Ms. Ho as a contributing factor in her February 8, 2022 disclosure.

37. By contrast, in 2021, Ms. Ho had proactively provided accommodation paperwork to Ingrid Olsson, a direct report of Ms. Spies, after Ms. Olsson mentioned experiencing anxiety during performance discussions.

38. In or about July 2023, Ms. Spies discussed her need to take leave to receive treatment for her PTSD, GAD and PDD, first with Ms. McEntyre and then with Ms. Ho. Ms. Ho

directed Ms. Spies to utilize FMLA leave for these treatment sessions, but despite having explicit knowledge of the severity of Ms. Spies' psychiatric conditions, Ms. Ho still failed to discuss or offer any accommodations.

39. Following Ms. McEntyre's resignation in August 2023, Ms. Spies began reporting directly to Sunil Tandon, Vice President of Global Procurement.

40. Subsequently, in or about December 2023, after receiving her first "Met Objectives" review rating in seven years, Ms. Spies also communicated her ongoing workload and mental health concerns to Mr. Tandon, but still received no information about accommodations.

41. It is clear that UGI was aware of Ms. Spies' disabilities and need for accommodations from her repeated disclosures and requests for assistance, yet it failed to address her needs or engage in an interactive process.

42. In or about July 2023, a newly formed group, Global Engineering and Construction, attempted changes that would improperly influence utility operations, which would be a violation of regulatory independence requirements.

43. The group pressured Ms. Spies to approve roles that appeared to be against the Affiliated Interest Agreement that had been filed with Pennsylvania Public Utility Commission (PUC) outlining how UGI Utilities, Inc. must interact with UGI Energy Services, the entity of which the majority of the Global Engineering and Construction group was comprised.

44. Ms. Spies believed these and other actions of the group could be a violation of the PUC Affiliated Interest Agreement requirements. Ms. Spies raised these concerns multiple times with management, first to Ms. McEntyre, and then later to Mr. Tandon, but she

received no direction or support in addressing the issue.

45. Subsequently, Ms. Spies filed an internal Ethics Complaint in or about August 2023 in an effort to address the situation.

46. The ongoing conflict and lack of managerial support surrounding this issue caused Ms. Spies significant additional stress, further exacerbating her existing disability symptoms.

47. In or about late November 2024, Ms. Spies had a major episode of vasovagal syncope and lost consciousness twice, likely sustaining a concussion.

48. Ms. Spies informed Mr. Tandon about this incident, as well as Ms. Ho, and disclosed that it was possible that she could lose her driver’s license due to this condition.

49. Shortly after this incident, on or about December 2, 2024, Ms. Spies emailed Mr. Tandon and requested to step down from her Manager role due to the extreme stress she was experiencing and in an effort to address her mental and physical health.

50. On or about December 4, 2024, during a subsequent one-on-one meeting, Mr. Tandon told Ms. Spies that they did not want to say she was “burned out.”

51. In January 2025, Ms. Spies, negotiated with Ms. Ho and Mr. Tandon to create the job description for her new role.

52. However, UGI did not accommodate Ms. Spies' request to step down from her manager role until May 6, 2025, approximately five months after her initial request.

53. Subsequently, in May 2025, James Cromyak was hired as the replacement for Ms. Spies’ previous position, and he became the Manager of Operational Procurement.

54. Shortly after beginning the position, on or about May 22, 2025, Mr. Cromyak sent Ms. Spies an unprompted email in which, referencing the changes he wished to implement

for the department, he stated, “do not view these changes as ‘I, Jamie, wasn’t given the support or opportunity to do those projects while I was the manager’, but rather ‘we can do them now because you are part of the team.’”

55. Ms. Spies was upset by this communication, and forwarded the message to Mr. Tandon, describing it as reflecting a “condescending tone and poor communication skills.”

56. Additionally, Ms. Spies requested support from Mr. Tandon due to concerns that Mr. Cromyak was making decisions without a full understanding of their consequences, upsetting employees, and  bypassing Ms. Spies to directly question others about performance review goals and standard department practices, matters he should have addressed with her.

57. On or about June 4, 2025, Ms. Spies believed she was meeting with Mr. Tandon for a scheduled one-on-one in one of the office’s conference rooms.

58. Upon arriving, Ms. Spies learned that the meeting had been relocated to HR, and that Ms. Ho would be attending.

59. Mr. Tandon offered no further explanation for this and only stated that Ms. Spies had “asked him to look into some things” so he had. Ms. Spies was not informed in advance that this would be a meeting with HR present.

60. At this meeting, Ms. Ho and Mr. Tandon asked Ms. Spies pointed questions about her concerns with Mr. Cromyak, and accused her of “undermining” Mr. Cromyak by consulting appropriate leadership contacts with relevant historical knowledge, in a mischaracterization of Ms. Spies' deliberate, good-faith fact-finding.  .Ms. Spies became so overwhelmed by the confrontational manner of this meeting and their characterizations that she had to leave the room before returning to finish the

conversation.

61. Upon her return, it was acknowledged that there was a communication gap, and Ms. Ho and Mr. Tandon stated they would speak to Mr. Cromyak as well.

62. The next day, on or about June 5, 2025, Ms. Spies had a conversation with Mr. Cromyak during which he apologized for his email, and they agreed that going forward they would address any issues directly.

63. Ms. Spies then understood the issue to generally be a misunderstanding that had been successfully resolved, and she informed Ms. Ho that she had engaged in a productive conversation with Mr. Cromyak.

64. However, only a few weeks later, on or about June 30, 2025, Ms. Spies received a text message from Mr. Tandon that stated, "Something has come up and I need to meet with you face to face."

65. He requested to meet with her in the office that day and to keep the meeting confidential.

66. Ms. Spies then met with Mr. Tandon, and Stephen Borza, the Director of HR. The office was empty, as it was a scheduled work-from-home day.

67. The tone of the meeting was extremely hostile.

68. Ms. Spies was informed by Mr. Tandon and Mr. Borza that Mr. Cromyak had resigned.

69. Mr. Tandon and Mr. Borza then accused Ms. Spies of being the reason for Mr. Cromyak's resignation, as well as the resignation of other employees that had left the company, including Mr. Marthinson.

70. Ms. Spies was further accused by Mr. Tandon and Mr. Borza of withholding information, being uncollaborative, and creating an environment in which employees feared retaliation from her. No specific examples were provided to support any of these allegations.

71. At one point during the meeting, Mr. Borza shouted, “this has been going on for years and it’s going to stop.”

72. Ms. Spies felt very intimidated during the meeting, as she was alone in the office being aggressively berated by two men.

73. The stress from this encounter caused Ms. Spies to dissociate and she struggled to fully retain the information that was provided to her and the allegations she was being accused of.

74. Ms. Spies later learned that Mr. Cromyak had resigned because he had received another offer from a company he had previously been considering prior to taking the position at UGI.

75. Ms. Spies was thus unnecessarily and unfairly singled out, disparaged and criticized, in noticeably differential treatment than her peers.

76. Subsequently, on or about July 8, 2025, Ms. Spies was given a Performance Expectations notice regarding the alleged issues discussed at the June 4th and June 30th meetings, and she was informed that HR had done an investigation on her going back to 2022.

77. In her twelve years of experience in management roles, Ms. Spies has never seen a performance warning that did not identify specific documented issues alongside a defined timeline for improvement. UGI's own standard Performance Improvement Plan template requires each issue to be accompanied by the specific expectation, the

documented result, and the business impact, as well as an overall improvement timeline. The performance memo issued to Ms. Spies departed from this standard format entirely.

78. The performance memo contained almost no substantive work-product or performance metrics.

79. With the exception of general policy compliance obligations, all eight sections of the memo consisted entirely of directives governing Ms. Spies' conduct, tone, and interpersonal communication.

80. One section was explicitly titled 'Specific Prohibited Behaviors.'

81. This behavioral focus was imposed on an employee whose documented disabilities, known to UGI for years, specifically include heightened frustration, emotional reactivity, and a rigid, over-controlled stress response.

82. The performance memo that Ms. Spies received required zero documented incidents violating the expectations, and stated thirteen times that she was to address any issues solely to her direct manager.

83. Rebecca Banks was serving as Ms. Spies’ temporary manager following Mr. Cromyak's resignation. Ms. Banks simultaneously held direct operational oversight of UGI Energy Services, the same entity whose separation from UGI Utilities the Affiliated Interest Agreement was designed to maintain, and the same entity at issue in Ms. Spies' 2023 internal ethics complaint.

84. This requirement effectively channeled all of Ms. Spies' concerns through a manager with an inherent conflict of interest under the AIA.

85. Additionally, the memo stated that there would be monthly check-in meetings to assess Ms. Spies’ progress, but no such meetings ever occurred.

86. In response to this reprimand, Ms. Spies sent an email to Mr. Tandon and Ms. Ho on or about July 10, 2025, explaining her symptoms of dissociation affecting her memory during stressful situations requesting clarifications from their prior meetings and stating that she would ensure her provider addressed any reasonable accommodations upon her return from FMLA leave.

87. Yet, no accommodation paperwork was provided to her.

88. Due to the stress of these encounters, Ms. Spies took FMLA leave for her disabilities beginning July 16, 2025, and lasting until August 27, 2025.

89. While she was on FMLA leave, Ms. Spies explicitly requested reasonable accommodation forms from UGI and was finally given them on August 12, 2025.

90. Ms. Spies provided the completed accommodations paperwork and all required documents to Ms. Ho on or about August 21, 2025, who stated it would take "up to a week" for review.

91. Despite promptly answering all follow-up questions and providing any needed information, processing of Ms. Spies' accommodations request took eight times longer than indicated.

92. Ms. Spies did not receive approval of her request until eight (8) weeks later, on or about October 16, 2025, in a clear failure of UGI to engage in a good faith interactive process with respect to her accommodations.

93. One of the accommodations that Ms. Spies requested for her disabilities was transcription of meetings.

94. This accommodation was requested to assist her in coping with dissociation, a symptom of her PTSD, in which she becomes disconnected from her surroundings during periods of acute stress, impairing her ability to accurately recall the content of stressful conversations.

95. When Ms. Spies asked Ms. Ho what she should do if someone in a meeting refused transcription, Ms. Ho stated, "If someone refuses transcription and you refuse to take notes, the meeting would be reduced to email."

96. In this dismissive manner, Ms. Ho characterized Ms. Spies' medical condition of dissociation as simply a refusal to take notes, making it clear that neither Ms. Ho, nor UGI, took Ms. Spies' disabilities or accommodations seriously.

97. Upon returning from FMLA leave, Ms. Spies began to experience even more severe differential, discriminatory and retaliatory treatment.

98. After returning to work, Ms. Spies learned that she was now excluded from key meetings that were a part of her core job duties and that she had previously attended, including the legal call, procurement and contracts meetings, and engineering and construction meetings.

99. When Ms. Spies attempted to set up the meeting with Mr. Tandon and Ms. Ho to discuss the July 10, 2025 email, as was previously discussed, Mr. Tandon and Ms. Ho refused. They stated only that Ms. Spies could provide a response to the notice to go in her personnel file, and that they would only be willing to discuss her performance expectations going forward.

100. On or about September 11, 2025, Ms. Spies informed Ms. Ho and Mr. Tandon that she would be filing a charge of discrimination with the EEOC.

101. On September 12, 2025, Ms. Ho responded disputing any basis for a charge and

outlining UGI's asserted good-faith efforts.

102. Ms. Spies continued to raise concerns and seek clarification regarding her July 10, 2025 questions on September 14 and September 15, 2025.

103. On September 19, 2025, Ms. Ho responded that UGI would “not be further replying unless you are not clear on the expectations going forward.”

104. Additionally, after several requests to meet, Ms. Spies finally met with the new Manager, Ms. Banks, on or about October 1, 2025, four weeks after Ms. Spies’ return to office.

105. Ms. Banks stated that she would be taking over direct communication with Mountaineer Gas, a task which is explicitly listed in Ms. Spies’ job description.

106. Ms. Spies was advised that this change was done at Mr. Tandon’s request.

107. Not only was this a retaliatory reassignment of Ms. Spies’ job duties, but it contradicted the core duties outlined in her job description, compromising her ability to achieve the goals set out for her for 2026.

108. On or about October 2, 2025, during a team meeting, a new employee was discussing processes and was being very condescending towards the team.

109. When Ms. Spies shared an industry statistic, the employee snapped rudely at Ms. Spies, calling her comparison irrelevant.

110. Ms. Spies responded that her comment was rude and asked her not to speak to her in that way.

111. Ahead of a scheduled 1:1 follow up meeting with Ms. Banks on October 3, 2025, Ms. Spies requested transcription of the call so that she could discuss the incident, but Ms. Banks refused, stating “I have spoken to Jodi about this and I am stating I do not

consent to the call being transcribed."

112. As a result, Ms. Spies addressed her concerns by email instead, explaining that she had dissociated during the exchange and had to ask coworkers afterward what she had said, recalling only that she said "that was rude" and asked her not to "talk to me like that."

113. In response, Ms. Banks reprimanded Ms. Spies over email for her response, telling her that "calling out another team member in front of the group was unprofessional and not the right way to address the concern."

114. To Ms. Spies' knowledge, the other employee did not suffer any significant consequences for her behavior.

115. In a subsequent conversation, Ms. Banks repeatedly excused the employee's behavior by describing her as "young and dumb."

116. On October 3, 2025, Ms. Spies emailed Ms. Banks questioning this reassignment and how it would affect her ability to achieve the 2026 goals set out for her.

117. Ms. Banks responded on October 6, 2025, but merely stated that "there was no determination to date." Ms. Banks never provided a response addressing Ms. Spies' questions about her performance expectations.

118. On October 20, 2025, Ms. Banks reached out to Ms. Spies and asked if she wanted to continue with one-on-one meetings, however, when Ms. Spies stated she wasn't aware the meetings had been scheduled, Ms. Banks said that she had not even added Ms. Spies to the invitation.

119. When Ms. Spies again asked if she could transcribe the one-on-one meetings, Ms. Banks continued to refuse without explanation.

120. This refusal by Ms. Banks to respect Ms. Spies' disability accommodations is clearly

motivated by discriminatory intent.

121. Additionally, while all other employees on the team received their 2025 performance reviews at an in-person meeting, Ms. Spies was sent her review via email and was never offered the option for a meeting prior to receiving the review.

122. For the 2025 performance review, Ms. Spies was given the second-lowest performance rating possible, and the lowest rating she had received in a decade.

123. In order to benchmark her performance, Ms. Spies requested data from the IT department to determine if the rating she received of "Did Not Meet Objectives" for "Focus on Continuous Improvement" was warranted. Ms. Banks characterized Ms. Spies' request for data as "personal reasons" versus a business request.

124. However, the data showed that Ms. Spies far exceeded others in requesting IT enhancements, including Ms. Banks. It also demonstrates that the rating was not based on any quantifiable data and that, in fact, Ms. Banks made no effort to quantify her rating.

125. Due to the significant stress caused by the review, and Ms. Banks refusal to allow for meeting transcription, Ms. Spies requested to communicate her questions to Ms. Banks regarding the performance review in writing rather than through a meeting.

126. Over two weeks later, on December 8, 2025, Ms. Banks responded and stated that she refused to respond to any questions regarding her performance review, and that UGI was confident that the review Ms. Spies received reflected her performance.

127. At a later date, on or about February 11, 2026, Ms. Banks attended a UGI Corporation Zoom meeting that utilized transcription services with no issue.

128. The meeting offered no option to opt out of the transcription, yet Ms. Banks attended the meeting and actively contributed despite the transcription being in effect.

129. When Ms. Spies noted this via email on February 17, 2026, and requested again for transcription services during their meetings, Ms. Banks continued to refuse without explanation.

130. This clearly differential treatment of Ms. Spies makes it evident that Ms. Banks only refused transcription services for Ms. Spies, specifically singling her out due to her disability.

131. Due to the ongoing discrimination, harassment and retaliation she was experiencing, Ms. Spies filed an EEOC Charge of Discrimination on January 22, 2026.

132. In an effort to mitigate the toll the workplace stress was taking on her health, Ms. Spies also began FMLA leave starting March 18, 2026, and was certified by her provider through June 18, 2026.

133. Beginning April 10, 2026, Ms. Spies began short-term disability leave.

134. However, on April 27, 2026, while on leave and in the process of an active and ongoing EEOC Charge, Ms. Spies received a notice that her employment would be terminated effective May 1, 2026.

135. She then received a follow-up letter stating that her termination date would instead be May 21, 2026, due to an extension of her STD leave and she would not be granted any further extension of her leave beyond May 20, 2026, despite her leave already being certified by her provider through June 18, 2026.

136. On May 8, 2026, Ms. Spies emailed UGI to note that her leave had been certified through June 18, 2026, with documentation faxed to Hartford on April 24, 2026, which had still not been reviewed as of May 6, 2026.

137. On May 15, 2026, UGI responded that while Ms. Spies' provider had certified her leave

through June 18, 2026, Hartford's approval reflected only June 2, 2026, and directed her to resolve the discrepancy with Hartford directly, while confirming the May 21, 2026 termination date would remain in effect.

138. Ms. Spies' termination is in clear retaliation for her utilization of FMLA leave.

139. Given her treatment during her employment with UGI, Ms. Spies maintains that she was subjected to discrimination and harassment on the basis of her disability or perceived disability, retaliation for complaining about discrimination and harassment, and retaliation for seeking accommodations for her disability, including FMLA leave.

140. Ms. Spies has suffered and continues to suffer mental anguish and severe emotional distress as a direct and proximate result of the actions and inactions of Defendant.

141. Defendant and its employees acted with the intent of causing, or in reckless disregard of the probability that their actions would cause, Ms. Spies severe emotional distress.

142. The timing of Defendant's termination of Plaintiff, less than one year before she reached age 50, caused a significant detrimental impact on her ability to collect early retirement benefits.

143. More specifically, Ms. Spies was terminated 10 months before reaching the age of 50. Had UGI kept her employed through age 50, Ms. Spies would have been eligible to collect her retirement benefits at the age of 62 with no penalty.

144. Instead, as a result of the premature, discriminatory, retaliatory termination of her employment after 27 years with the company less than 10 months before she turned 50, Ms. Spies cannot begin to collect these benefits without penalty until age 65. The penalty for Ms. Spies attempting to collect her retirement benefits early (beginning at age 55 through 64) is drastically higher as a result of her termination.

145. For example, had Ms. Spies continued employment through age 50, she could collect Retirement benefits starting at age 55 and receive 65% of her benefit. Ages 56, 57, 58, 59, 60 and 61 would have been paid at 70%, 75%, 80%, 85%, 90% and 95% respectively.

146. As a result of her termination prior to her turning 50, if Ms. Spies attempted to collect her retirement benefit at age 55, she would now receive only 32.541% of her benefit. Ages 56, 57, 58, 59, 60, 61, 62, 63 and 64 result in percentages of 36.1%, 40.11%, 44.637%, 49.762%, 55.582%, 62.21%, 69.783%, 78.465%, and 88.457% respectively.

147. The financial impact of UGI's decision to terminate Ms. Spies when it did cannot be overstated.

148. Ms. Spies has suffered financial and other losses including, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit as a direct and proximate result of the actions and inactions of Defendant.

## COUNT I
### The Americans with Disabilities Act, 42 U.S.C. §12101, et seq.

149. Plaintiff Jamie C. Spies repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

150. Based on the foregoing, Defendant engaged in unlawful employment practices in violation of the Americans with Disabilities Act.

151. In discriminating against and harassing Plaintiff on the basis of her disability, and/or because Defendant regarded Plaintiff as disabled, and in retaliating against Plaintiff, Defendant violated the ADA.

152. Defendant's violations were intentional and willful.

153. Defendant's violations warrant the imposition of punitive damages.

154. As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

155. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

**COUNT II**
**The Family and Medical Leave Act, 29 U.S.C. § 2611, et seq.**

156. Plaintiff Jamie C. Spies repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

157. Defendant's conduct, in retaliating against Plaintiff for requesting and taking leave pursuant to the Family and Medical Leave Act and in interfering with Ms. Spies' rights under the FMLA by terminating her while on leave, violated the FMLA.

158. Defendant's violations of the FMLA were intentional and willful, as Defendant knew or should have known the requirements of the FMLA.

159. Defendant's violations of the FMLA warrant the imposition of liquidated damages.

160. Defendant's violations of the FMLA warrant the imposition of punitive damages.

161. As a direct and proximate result of Defendant's violations of the FMLA, Plaintiff has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of earning power, back-pay, front-pay, interest due thereon, and has incurred attorneys' fees and costs.

162. Plaintiff is suffering and will continue to suffer irreparable harm and monetary damages as a result of Defendant's actions unless and until this Court grants the relief requested herein.

**COUNT III**
**Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.**

163. Plaintiff Jamie C. Spies repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

164. Based on the foregoing, Defendant has engaged in unlawful employment practices in violation of the ADEA.

165. Plaintiff is, and was at the time of her termination, over forty years of age, and was an individual within the class protected by the Age Discrimination in Employment Act.

166. In discriminating against and harassing Ms. Spies because of her age, Defendant violated the Age Discrimination in Employment Act.

167. Defendant's violations were intentional and willful.

168. Defendant's willful violations of the ADEA warrant an award of liquidated damages.

169. As the direct and proximate result of Defendant's violation of the Age Discrimination in Employment Act, Plaintiff Jamie C. Spies has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

**PRAYER FOR RELIEF**

170. Plaintiff Jamie C. Spies repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

WHEREFORE, Plaintiff Jamie C. Spies respectfully requests that this Court enter judgment in her favor and against Defendant UGI Utilities, Inc., and Order:

a. Appropriate equitable relief including reinstatement or front pay and restoring Plaintiff to her position to achieve the qualifying age for purposes of receiving correct pension benefits;

b. In the alternative to equitable relief of restoring Plaintiff to her position for puproses of receiving correct pension benefits, Defendant to pay monetary damages for the loss of pension benefits that Plaintiff would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

c. Defendant compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

d. Defendant pay Plaintiff punitive damages;

e. Defendant pay Plaintiff liquidated damages;

f. Defendant pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g. Defendant pay Plaintiff's costs of bringing this action, including, but not limited to, Plaintiff's reasonable attorneys' fees;

h. Plaintiff be granted any and all other remedies available pursuant to the ADA, ADEA, the FMLA, and/or any other applicable law; and

i. Such other and further relief as is deemed just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury as to all issues so triable.

*/s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
One Penn Center
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103

*Attorneys for Plaintiff Jamie C. Spies*

Dated: September 9, 2026